UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

RAYMOND SMITH, #153086,    )
    )
    Plaintiff,    )    Case No. 1:08-cv-693
    )
v.    )    Honorable Robert Holmes Bell
    )
JOSH STOLEY, et al.,    )
    )    **REPORT AND RECOMMENDATION**
    Defendants.    )
_____)

This is a civil rights action brought *pro se* by a state prisoner under the Religious

Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-2(a), and 42 U.S.C. §

1983. Plaintiff is currently an inmate at the Muskegon Correctional Facility (MCF). The defendants

are Corrections Officer Dan Milu, Chaplain Josh Stoley,[1] and Assistant Deputy Warden (ADW)

Anthony Stewart. Plaintiff alleges that on November 5, 2007, Officer Milu conducted the pack-up

of plaintiff's personal property at the Riverside Correctional Facility (RFC) in connection with

plaintiff's transfer from RCF to the Michigan Reformatory (RMI).[2] Plaintiff claims that defendant

Milu failed to record on plaintiff's prisoner personal property receipt that he had taken the following

items of plaintiff's personal property: six and one-half vials of oil, a container of shoe polish, a

---

[1]Plaintiff's complaint erroneously identified defendant Stoley as "John." The case caption
has been amended to correct this error. (*see* docket # 18, Ex. E).

[2]Michigan prison security classifications range from Levels I through V. Level V is the
highest security level, housing the most dangerous and incorrigible prisoners. RCF was a Level II
prison, closed in November 2007. RMI houses Level IV prisoners.

wooden bowl, incense, and a blue bag. Plaintiff alleges that Officer Milu's actions violated his rights under the Fourteenth Amendment's Due Process Clause. (Complaint, ¶¶ 2-15, docket # 1).

Plaintiff alleges that he informed RMI's Chaplain Stoley that he wanted to posses personal religious property beyond what the Michigan Department of Corrections (MDOC) permits under Policy Directive 05.03.150, and that he desired permission to cover his cell window (a violation of prison security rules) because he wanted to perform unspecified Wiccan rituals naked. Chaplain Stoley forwarded these requests to ADW Stewart. Defendant Stewart denied plaintiff's requests. Plaintiff alleges that defendants Stoley and Stewart violated his statutory rights under RLUIPA and his First Amendment rights under the Free Exercise Clause. (Complaint, ¶¶ 32-66). Further, plaintiff alleges that defendant Stoley violated his rights under the Fourteenth Amendment's Equal Protection Clause because RMI's chapel library did not include Wiccan materials. Plaintiff seeks an award of monetary damages and injunctive relief against defendants in their individual and official capacities.

The matter is before the court on defendants' motion for summary judgment. (docket # 17). On January 6, 2009, plaintiff filed his response (docket #'s 21, 22), and defendants' motion is ready for decision. For the reasons set forth herein, I recommend that defendants' motion for summary judgment be granted, and that judgment be entered in defendants' favor on all plaintiff's claims.

## Applicable Standards

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *S.S. v. Eastern Ky. Univ.*, 532 F.3d 455, 452 (6th Cir. 2008). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *El Bey v. Roop*, 530 F.3d 407, 413 (6th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Smith v. Williams-Ash*, 520 F.3d 596, 599 (6th Cir. 2008).

When the party without the burden of proof seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e); *see Helms v. Zubaty*, 495 F.3d 252, 255 (6th Cir. 2007). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472,

1478 (6th Cir. 1990). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252); *see Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 398 (6th Cir. 2007).

## Proposed Findings of Fact

The following facts are beyond genuine issue. Plaintiff is currently in the custody of the Michigan Department of Corrections (MDOC) on a life sentence imposed in 1978 for a first degree murder conviction and a sentence of 2-to-5 years' imprisonment on a later conviction for prison escape. Until June 23, 2007, plaintiff had identified himself as a Baptist. On June 23, 2007, he filed a declaration of religious preference form proclaiming that he was a Wiccan. (docket # 1, ¶ 19).

On November 5, 2007, plaintiff's personal property was packed up in connection with his transfer from the Riverside Correctional Facility (RCF), which was being closed by the State, to the Michigan Reformatory (RMI). Under Policy Directive 04.07.112, Officer Milu was required to complete a personal property receipt itemizing all plaintiff's property. (docket # 18, Ex. A, ¶ W). The policy directive specified that, "If an item is believed to be contraband it shall be confiscated and a Contraband Removal Record (CSJ-284) issued to the prisoner. The prisoner also shall be issued either a misconduct report as set forth in PD 03.03.105 'Prisoner Discipline' or a Notice of Intent to Conduct an Administrative Hearing (CSJ-282)." (*Id.*, ¶¶ GG). Officer Milu listed plaintiff's personal property on a personal property receipt, and none of the property was identified as contraband. (docket # 1, Ex A). Officer Milu did not issue a notice of intent to conduct an administrative hearing or a misconduct report. Officer Milu and plaintiff both signed the prisoner

personal property receipt directly under the following heading: "Signature of the packing officer and prisoner indicate that the property receipt is complete and correctly itemized." (docket # 1, Ex. A). Nonetheless, plaintiff now states that Officer Milu confiscated six and one-half vials of oil, a container of shoe polish, a wooden bowl, incense, and a blue bag without issuing a notice of intent. (Complaint, ¶¶ 6-15).[3] On November 6, 2007, plaintiff was transferred to RMI.

On December 3, 2007, plaintiff sent a kite (informal complaint) to RMI's Chaplain Josh Stoley. (docket # 1, Ex. J). Plaintiff inquired regarding the dates and times scheduled for RMI's group Wiccan services and requested a list of the personal religious items that Wiccan prisoners were permitted to possess under MDOC Policy Directive 05.03.150. Chaplain Stoley responded that under the policy directive plaintiff was entitled to possess a deck of Tarot cards and a Celtic cross or Pentacle. (*Id.*). Chaplain Stoley stated that RMI's group Wiccan services were offered on eight annual Sabbats and indicated that the next Sabbat was scheduled for December 21, 2007. (docket # 1, Ex. J). Plaintiff asked that he be scheduled to attend the December 21, 2007 Sabbat. (docket # 1, Ex. K). Group services are governed by Policy Directive 05.03.150, which states, " a service is not required to be conducted if there are less than five prisoners within the same security level of that institution who actively participate in the religious activities of a group." (docket # 18, Ex. B, ¶ X). The purpose of this policy is to conserve limited resources as to the prison staff available to monitor prisoner interactions in a group setting and the limited space available for

---

[3]Plaintiff's complaint is not a verified under penalty of perjury. His brief in response to defendants' motion seeks to incorporate the complaint by reference and concludes with a verification under penalty of perjury. (docket # 21 at 4, 6). This practice is highly disfavored because it mixes together the plaintiff's legal arguments and his factual allegations. Nonetheless, I have treated the factual allegations plaintiff made in his complaint as verified under penalty of perjury. *See El-Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008).

group services.  (docket # 18, Ex. D, ¶ 4).  On December 21, 2007, plaintiff did not receive a "detail" for a Sabbat service at RMI, because no other prisoner requested to attend.  (Stoley Aff. ¶ 8).

In December of 2007, plaintiff sent a kite to Chaplain Stoley asking for numerous personal property items that he knew he was not permitted to possess under Policy Directive 05.03.150.  He supplied defendant Stoley with what he labeled as a "Relief Sheet," listing numerous items which he claimed to need for practicing his Wiccan faith.  (docket # 1, Ex. N).  Plaintiff asked for a knife or "athame, a crystal ball, candles, incense and a senser, "fruits, mint tea, etc. . . ."  (*Id.*).  Plaintiff wanted the State to supply him with a coffee pot and access to a microwave for making hot water and a desk and chair or stool for him to "purify" with the hot water.  Further, plaintiff desired the special accommodation of allowing him cover his cell window as previously mentioned.  (*Id.*).

For security reasons, oils are not allowed for prisoner use.  Prisoners can use oils to help them slip out of restraints.  Oils can be set aflame and thrown on persons.  The burning oil sticks to a person's skin, hair and clothing, resulting in very serious and potentially lethal burns.  (docket # 18, Ex. D, Mike Martin Aff., ¶ 7).  In similar fashion, hot water can be used as a weapon.  Plaintiff has filed a declaration stating that as of "11/15/04," more than three years before the period at issue, lip balm, medicated chest rub, and a few other items which plaintiff labels as "combustible," were sold at an unidentified prison store.  (docket # 1, Ex. CC).  The MDOC does not allow ceremonial robes because they provide places to conceal contraband.  Most robes are worn loosely, making it easy to conceal contraband on one's person.  Further, prisoners can misuse robes by wearing them with no clothes underneath, making it very easy for prisoners to expose themselves.  (Martin Aff. ¶ 8).  Bells are not allowed because they can be used to signal other prisoners or to sound a notice to commence disruptive behavior.  (*Id.*, ¶ 9).  Crystals and crystal balls are not

allowed because the glass or crystals can be broken and used as weapons. Plants and flowers are not allowed. It is easy to conceal contraband in the soil of potted plants and to conceal contraband on or in flowers. To adequately search plants and flowers results in the destruction of the plants and flowers. (*Id.*, ¶ 11). Food items, including herbs and herbal teas, are not allowed because it is difficult to control the content of liquids and foods. Some food items are required to be kept hot or cold to assure that they are safe. No equipment is readily available to assure that food items can be kept safe until consumed at a religious service. (*Id.*, ¶ 6). Plaintiff declares that incense and oils are not the only products MDOC prisoners use to mask the odor of marijuana smoke. He then lists two types of deodorant and three types of antiperspirant available in prison stores and describes how prisoners misuse antiperspirant and toilet paper to manufacture "prisonmade/homemade incense." (docket # 1, Ex. CC).

Chaplain Stoley responded to plaintiff's "relief sheet" demands by explaining that neither he or ADW Stewart could flout the MDOC's uniform standards. The only relief would be by amendment of Policy Directive 05.03.150, which plaintiff could request from the Correctional Facilities Administration's Special Activities Coordinator as specified in Policy Directive 05.03.150, paragraphs II through KK. (Stoley Aff., ¶ 4). Chaplain Stoley nonetheless forwarded plaintiff's requests to ADW Stewart. (*Id.*, ¶ 5). Defendant Stewart denied the requests. Plaintiff states that he performs "certain sacred circle rituals while 'sky-clad: [n]aked." (Complaint ¶ 58). He has spared the court any detailed description of what he does during these naked rituals or their purpose or meaning. He does state that he usually "only strips to his underwear." (*Id.*, ¶ 59). Plaintiff was not satisfied with the level of privacy that his RMI prison cell afforded. (*Id.*). According to plaintiff, ADW Stewart denied his request to cover his cell window because it was not compatible with RMI's

security level and because prison guards would not be able to observe plaintiff and prevent him from potentially engaging in sexual or other forms of misconduct. (*Id.*, ¶¶ 54-60).

On or about December 12, 2007, plaintiff asked Chaplain Stoley if RMI's Chapel Library contained any books or tapes on Wicca. Defendant Stoley responded that no such books had been donated. All the books in the library were donated by outside sources and there was no budget for purchasing books or tapes. (Stoley Aff. ¶ 7). On July 22, 2008, plaintiff filed his complaint.

## Discussion

### I. Mootness

Plaintiff is currently an inmate at the Muskegon Correctional Facility (MCF). His claims for declaratory and injunctive relief regarding conditions at his former prison are moot as a result of his confinement at MCF. *See Cardinal v. Metrish*, 564 F.3d 794, 789-99 (6th Cir. 2009); *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996).

### II. Eleventh Amendment Immunity

#### A. Constitutional Claims

Plaintiff's constitutional claims for monetary damages against defendants in their official capacities are barred by Eleventh Amendment immunity. Eleventh Amendment immunity is a threshold issue that should be raised and decided by the trial court. *See Nair v. Oakland County Cmty. Mental Health Auth.*, 443 F.3d 469, 474 (6th Cir. 2006); *Rossborough Mfg. Co. v. Trimble*, 301 F.3d 482, 489 (6th Cir. 2002). A suit against a state officer in her official capacity is simply another way of pleading an action against the state. *See Will v. Michigan Dep't of State Police*, 491

U.S. 58, 71 (1989). The Eleventh Amendment generally[4] bars suit in federal court against a state and its departments or agencies unless the state has waived its sovereign immunity or unequivocally consented to be sued. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Skinner v. Govorchin*, 463 F.3d 518, 524 (6th Cir. 2006). The State of Michigan has not consented to civil rights suits in federal court. *See Johnson v. Dellatifia*, 357 F.3d 539, 545 (6th Cir. 2004); *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). Furthermore, States and their departments are not "persons" within the meaning of 42 U.S.C. § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. at 71. Defendants are entitled to judgment in their favor as a matter of law on plaintiff's claims for monetary damages against defendants in their official capacities.

> B.     Statutory RLUIPA Claims

Defendants seek dismissal of plaintiff's statutory RLUIPA claims for monetary damages against them in their official capacities on Eleventh Amendment immunity grounds. The Sixth Circuit's decision in *Cardinal v. Metrish*, 564 F.3d 794, 799-801 (6th Cir. 2009), is controlling. The Eleventh Amendment bars plaintiff's claims for monetary relief under RLUIPA.

## III.     Due Process Claim Against Officer Milu

Plaintiff alleges that Officer Milu confiscated various items of his personal property without issuing a notice of intent to conduct an administrative hearing and without conducting an

---

[4] The well-recognized exception to the general rule is an action for prospective, non-monetary relief such as an injunction against a state officer in his or her official capacity based upon a claim that the state officer's action is unconstitutional. *See Ex Parte Young*, 209 U.S. 123 (1908); *see also Edelman v. Jordan*, 415 U.S. 651, 664 (1974); *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005)(*en banc*).

administrative hearing in violation of Policy Directive 04.07.112, ¶¶ W, HH.[5]  Under this policy

directive, "Unless the prisoner waives the administrative hearing in writing and the prisoner and staff

agree on disposition of the property as authorized by this policy, a hearing shall be conducted

pursuant to Administrative Rule 791.3310 for the hearing officer to determine if the property is

contraband and, if so, the appropriate disposition of the property." (docket # 18, Ex. A, ¶¶ HH).  It

is well established that a state prisoner asserting a procedural due-process claim arising from a

random and unauthorized act of a state officer must first plead and prove the absence of an adequate

state remedy.  *See Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*,

474 U.S. 327 (1986); *Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir. 1995);  *see also Morris

v. Cason*, 102 F. App'x 902, 903 (6th Cir. 2004).  If an adequate post-deprivation remedy exists, the

deprivation, although real, is not "without due process of law."  *Parratt*, 451 U.S. at 537.  This rule

applies to both negligent and intentional deprivation of property, as long as the deprivation was not

done pursuant to an established state procedure.  *See Hudson v. Palmer*, 468 U.S. 517, 530-36

(1984).[6]  The Sixth Circuit recognizes that Michigan's available post-deprivation remedies are more

than adequate to compensate plaintiff for any loss of personal property suffered as a result of

---

[5]Plaintiff's allegation that Officer Milu was too busy to adequately address plaintiff's "demand" for a hearing because he was helping "pack up almost 600 prisoners and move them" in the mass movement of  prisoners associated  with RCF's closing (Complaint, ¶¶ 12, 13) fails to allege a viable due process claim.  *See Carlton v. Jondreau*, 76 F. App'x 642, 643 (6th Cir. 2003)("No due process claim is stated for the negligent deprivation of property.").

[6]Numerous state post-deprivation remedies were available to him plaintiff.  A prisoner who incurs a loss through no fault of his own may petition the institution's Prisoner Benefit Fund for compensation.  (docket # 18, Ex. A, ¶ B). Aggrieved prisoners may also submit claims for property loss of less than $1,000 to the State Administrative Board.  *See* MICH. COMP. LAWS § 600.6419(1). Alternatively, Michigan law authorizes actions in the Court of Claims asserting tort or contract claims "against the state and any of its departments, commissions, boards, institutions, arms, or agencies." MICH. COMP. LAWS § 600.6419(1)(a).

defendant's alleged actions. *See Copeland v. Machulis*, 57 F.3d at 479; *see also Carlton v. Jondreau*, 76 F. App'x at 643. I find that defendant Milu is entitled to judgment in his favor as a matter of law on plaintiff's Due Process Clause claim.

IV. **Equal Protection Clause**

Plaintiff's Equal Protection Clause claim against Chaplain Stoley based on the absence of Wiccan materials in the items donated to RMI's chapel library as of December 2007 requires little discussion. The Equal Protection Clause of the Fourteenth Amendment states that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1; *see Michael v. Ghee*, 498 F.3d 372 (6th Cir. 2007). Plaintiff was required to present evidence demonstrating "'intentional and arbitrary discrimination' by the state; that is, he must demonstrate that he "[was] intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Plaintiff received the same treatment as RMI's prisoners. RMI's chapel library is comprised of donated items. Defendant Stoley had no control over what others elected to donate. The revenue and expense statement regarding RMI's 2008 prisoner benefit fund expenditures (docket # 22, Ex. D) that plaintiff filed in response to the motion for summary judgment does nothing to advance this claim against defendant Stoley. Chaplain Stoley was not responsible for approving or denying expenditures from RMI's prisoner benefit fund. (docket # 18, Ex. F, ¶ J). Defendant Stoley is entitled to judgment in his favor as a matter of law.

**V.     RLUIPA Claims for Monetary Damages Against Defendants
        Stoley and Stewart in Their Individual Capacities**

Plaintiff sued defendants Stoley and Stewart in their individual capacities for damages under RLUIPA. RLUIPA's section 3 provides that "[a] person may assert a violation of this chapter as a claim . . . in a judicial proceeding and obtain appropriate relief against a government."[7]  42 U.S.C. § 2000cc-2(a). The question squarely presented is whether "appropriate relief" under this statute includes an action against defendants in their individual capacities for monetary damages. I find that RLUIPA, as an exercise of Congress' power under the Spending Clause, does not provide a cause of action for damages against defendants in their individual capacities.

The Sixth Circuit, in response to a "facial challenge" to section 3 of RLUIPA, has upheld the statute as a valid exercise of Congress' power under the Spending Clause, Article I, section 8, clause 1 of the Constitution "to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States." *Cutter v. Wilkinson*, 423 F.3d 579, 590 (6th Cir. 2005). A finding that a statute is facially valid is an extremely narrow judicial determination. *See Cutter v. Wilkinson*, 544 U.S. 709, 726 (2005). Although the Sixth Circuit's holding that section 3 of RLUIPA as a facially valid exercise of Congress' Spending Clause power is narrow in its scope, the holding has critical consequences for the remedies available to an incarcerated plaintiff asserting a claim under the statute.

An exercise of Congress' spending power is in the nature of a contract:
Turning to Congress' power to legislate pursuant to the spending power, our cases have long recognized that Congress may fix the terms on which it shall disburse federal money to the

---

[7]The term "government" is defined in RLUIPA as: "(i) a State, county, municipality, or other governmental entity created under the authority of a State; (ii) a branch, department, agency, instrumentality, or official of an entity listed in clause; and (iii) any other person acting under color of State law." 42 U.S.C. § 2000cc-5.

States.  Unlike legislation enacted under § 5, however, legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.  The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract."  There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it.  Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.  By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation.

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)(internal citations omitted).

RLUIPA's "contractual nature" limits the scope of remedies available under the statute.  *See Gebser v. Largo Vista Independent Sch. Dist.*, 524 U.S. 274, 287 (1998).  When Congress attaches conditions to the award of federal funds under its spending power (as it has in Title IX and Title VI), the Supreme Court "examine[s] closely the propriety of private actions holding the recipient liable in monetary damages for noncompliance with the condition.  Our central concern in that regard is with ensuring that the receiving entity of federal funds [has] notice that it will be liable for a monetary award."  *Gebser*, 524 U.S. at 287 (internal citations and quotation marks omitted).

Defendants are not "recipients" of federal funds and cannot properly be held liable for monetary damages under Congress' Spending Clause powers:

The Government's enforcement power may only be exercised against the funding recipient, see § 1682, and we have not extended damages liability under Title IX to parties outside the scope of this power.  *See National Collegiate Athletic Assn. v. Smith*, 525 U.S. 459, 467, n. 5, 119 S.Ct. 924, 929, n. 5, 142 L.Ed.2d 929 (1999) (rejecting suggestion "that the private right of action available under ... § 1681(a) is potentially broader than the Government's enforcement authority").

*Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 641 (1999); *see National Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 468 (1999).  Every federal appellate court that has addressed the issue has held that RLUIPA, as an exercise of Congress' Spending Clause

power, does not authorize a claim for damages against defendants in their individual capacities. *See*

*Nelson v. Miller*, No. 08-2044, __ F.3d __, 2009 WL 1873500, at * 15-18 (7th Cir. July 1, 2009);

*Rendelman v. Rouse*, 569 F.3d 182, 187-89 (4th Cir. 2009); *Sossamon v. Lone Star State of Texas*,

560 F.3d 316, 327-29 (5th Cir. 2009); *Smith v. Allen*, 502 F.3d 1255, 1274 (11th Cir. 2007). It is

highly probable that the Sixth Circuit will join the Fourth, Fifth, Seventh, and Eleventh Circuits and

hold that RLUIPA does not provide a cause of action for monetary damages against state employees

in their individual capacities for monetary damages. Accordingly, I find that defendants are entitled

to judgment in their favor as a matter of law on all plaintiff's RLUIPA claims for damages against

defendants in their individual capacities. Alternatively, for the reasons set forth herein in Section

IV(B), I find that defendants are entitled to qualified immunity on these claims.

## IV.     Qualified Immunity

Plaintiff seeks an award of damages against defendants Stoley and Stewart in their

individual capacities under section 1983 and RLUIPA. Defendants have asserted the defense of

qualified immunity. "The purpose of the qualified immunity defense is to protect public officials

from undue interference with their duties and from potentially disabling threats of liability." *Perez*

*v. Oakland County*, 466 F. 3d 416, 426 (6th Cir. 2006). When a defendant raises the defense of

qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled

to qualified immunity. *See Haynes v. City of Circleville*, 474 F.3d 357, 362 (6th Cir. 2007); *Baker*

*v. City of Hamilton*, 471 F.3d 601, 605 (6th Cir. 2006).

In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court held that "govern-

ment officials performing discretionary functions, generally are shielded from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818; *see Hudson v. Hudson*, 475 F.3d 741, 744 (6th Cir. 2007). The question whether qualified immunity attaches to an official's actions is a purely legal issue for the court. *See Fox v. DeSoto*, 489 F.3d 227, 235 (6th Cir. 2007); *Swiecicki v. Delgado*, 463 F.3d 489, 497 (6th Cir. 2006).

The Supreme Court's decision in *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), endorsed a two-prong analysis for addressing qualified immunity issues. The first prong is whether the plaintiff has alleged and supported with evidence[8] facts showing that the defendant's conduct violated a constitutional or statutory right. *Saucier*, 533 U.S. at 201; *see Scott v. Harris*, 550 U.S. 372, 377 (2007); *Marvin v. City of Taylor*, 509 F.3d 234, 244 (6th Cir. 2007). The second prong of the qualified immunity inquiry is whether the right was "clearly established" at the time of the defendant's alleged misconduct. *Saucier*, 533 U.S. at 201. Judges are permitted to exercise their "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). Here, I find that the sequence endorsed by the Court in *Saucier* is appropriate, and the prongs of the qualified immunity analysis will be addressed in the order they are listed above.

---

[8]A qualified immunity defense can be asserted at various stages of the litigation, including the summary judgment stage. *See English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994). The qualified immunity inquiry at the summary judgment stage is distinguished from the Rule 12(b)(6) stage in that generalized notice pleading no longer suffices, and the broader summary judgment record provides the framework within which the actions of each individual defendant must be evaluated. *See Riverdale Mills Corp. v. Pimpare*, 392 F.3d 55, 62 (1st Cir. 2004). At the summary judgment stage, a plaintiff may not rely on his pleadings. Rather, the issue is whether "the plaintiff has offered sufficient evidence to indicate that what the official did was objectively unreasonable in light of the clearly established constitutional rights." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 905 (6th Cir. 2004).

A.    First Amendment Claims

The First Amendment states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.  The latter clause is the Free Exercise Clause.  The  Supreme Court has held that by incorporation through the Fourteenth Amendment, the Free Exercise Clause applies to the States.  *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  A prisoner retains only those First Amendment freedoms which are "'not inconsistent with his status as a prisoner or with legitimate penological objectives of the corrections system.'"  *Smith v. Campbell*, 250 F.3d 1032, 1036 (6th Cir. 2001)(quoting *Pell v. Procunier*, 417 U.S. 817,  822 (1974)); *see Turner v. Safley*, 482 U.S. 78 (1987).  Lawful incarceration legitimately requires the retraction or withdrawal of many rights and privileges as a necessary consequence of society's need to deter and punish crime.  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).  "The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives -- including deterrence of crime, rehabilitation of prisoners, and institutional security."  *Pell v. Procunier*, 417 U.S. at 822-23.  "The Supreme Court has held that in most circumstances, prison officials 'should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

In *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), the Supreme Court held that the constitutionality of prison regulations that infringe upon a prisoner's rights under the First Amendment must be evaluated under the test of *Turner v. Safley*, 482 U.S. 78 (1987). The Supreme Court noted that it is well established that lawful incarceration legitimately requires restrictions on

-16-

many rights and privileges as a necessary consequence of a criminal conviction. *O'Lone*, 482 U.S. at 348.

> [S]uch a standard is necessary 'if prison administrators ..., and not the courts [are] to make the difficult judgments concerning institutional operations.' *Jones v. North Carolina Prisoner's Union*, 433 U.S. [119,] 128, 97 S.Ct. 2532, 53 L.Ed.2d 629 [ (1977) ]. Subjecting day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decision making process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby 'unnecessarily perpetuat[ing] the involvement of the federal courts in the affairs of prison administration.' *Procunier v. Martinez*, 416 U.S. [396], 407, 94 S.Ct. 1800, 40 L.Ed.2d 224 [ (1974) ].

*Turner*, 482 U.S. at 89. The familiar *Turner* factors are: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) what impact that accommodation of the asserted constitutional right will have on other guards and inmates; and (4) whether there are other readily available alternatives at a *de minimis* cost to valid penological interests. *Turner*, 482 U.S. at 89-91. The *O'Lone* opinion closed with the statement, "We take this opportunity to reaffirm our refusal, even where claims are made under the First Amendment, to substitute our judgment on difficult and sensitive matters of institutional administration for the determinations of those charged with the formidable task of running a prison." 482 U.S. at 353 (internal citation omitted).

Defendants Stoley and Stewart lacked the power to modify Policy Directive 05.03.150. Even assuming *arguendo* that they had such authority, Policy Directive 05.03.150 and its limitations have been upheld as a valid under the *Turner* test. This court rejected virtually

identical First Amendment and RLUIPA claims by a Wiccan prisoner in *Marsh v. Granholm*, No. 2:05-cv-134, 2007 WL 2683216, at * 1-2 (W.D. Mich. Sept. 7, 2007). There was a rational connection between the MDOC's regulation and the legitimate governmental interest put forward to justify it; the prisoner retained alternative means of exercising his Wiccan faith; accommodation beyond that already provided in the policy would have an adverse effect on prison security; and there were no other readily available alternatives at a *de minimis* cost to valid penological interests:

> Food and mixing bowls are not allowed because it is difficult to control food and liquid content. Similarly, oils are not allowed because they can be used to slip out of restraints and burning oil sticks can potentially cause personal harm. Robes are not allowed because they can be used to conceal contraband and make it easy for prisoners to expose themselves. Bells are not allowed because they can be used in the prison as signals to other prisoners. A crystal ball is not allowed because of the potential for use as a weapon. Plants and flowers are not allowed because they can easily hide contraband and require destruction for a proper search. . . . [The plaintiff's rights were] clearly being accommodated by the MDOC and those minimal restrictions imposed by the MDOC on the Wiccan religion [were] served by a compelling state interest. Plaintiff cannot overcome the necessary interests of the MDOC to preserve security in the prison.

*Id.* at * 4. The dangers posed by prisoners' covering their cell windows in order to facilitate violent assaults, other types of misconduct, and suicide attempts are well-documented. *See e.g.*, *Woodward v. Weberg*, 2:06-cv-284, 2009 WL 310898, at * 1 (W.D. Mich. Feb. 6, 2009); *Little v. Shelby County, Tenn.*, 384 F. Supp. 2d 1169, 1178 n. 17 (W.D. Tenn. 2005). Prison security is not only a legitimate governmental interest, it is recognized as a compelling governmental interest. *See Hoevenaar v. Lazaroff*, 422 F.3d 366, 368 (6th Cir. 2005); *Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979, 983 (8th Cir. 2004) ("Institutional security is the most compelling governmental interest in a prison setting, and security is particularly important in dealing with group activities because of the potential for riots and the extensive damage resulting therefrom."). Plaintiff has not disputed that he retained alternative means for practicing his Wiccan faith. The impact that accommodation of the asserted

constitutional right would have on guards and inmates is obvious: it makes an already dangerous environment even more dangerous. There are no other readily available alternatives at a *de minimis* cost to valid penological interests. No reasonable trier of fact could find that defendants' actions violated plaintiff's First Amendment rights under the Free Exercise Clause. Defendants are entitled to judgment in their favor as a matter of law on plaintiff's Free Exercise claims.

Assuming *arguendo* that plaintiff had been able to satisfy the initial requirement under *Saucier*, he would nonetheless fall short of showing that the right each claims a defendant violated was "clearly established" such that a reasonable official in the each defendant's position, at the time the act was committed, would have understood that his or her behavior violated that right. 533 U.S. at 201. "This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 129 S. Ct. at 822. The Supreme Court's decision in *Brosseau v. Haugen*, 543 U.S. 194 (2004), examined the underlying purpose of requiring that the law be clearly established:

> Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, misapprehends the law governing the circumstances she confronted. . . . Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at the time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

543 U.S. at 198. The Supreme Court and the Sixth Circuit have emphasized that the second inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. at 198 (quoting *Saucier*, 533 U.S. at 201); *see Silberstein v. City of Dayton*, 440 F.3d 306, 316 (6th Cir. 2006). "'[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense." *Lyons v.*

*City of Xenia*, 417 F.3d 565, 572 (6th Cir. 2005) (quoting *Brosseau*, 543 U.S. at 199); s*ee Perez*, 466 F.3d at 428 ("Because most legal rights are clearly established at some level of generality, immunity would be impossible to obtain if a plaintiff were required only to cite an abstract legal principle that an official had 'clearly violated.'"). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Nadar v. Blackwell*, 545 F.3d 459, 473 (6th Cir. 2008)("[Q]ualified immunity applies unless *any officer* in the defendant's position would have clearly understood that he was under an affirmative duty to have refrained from such conduct."). "Thus, '[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (quoting *Saucier*, 533 U.S. at 201). Although it is not always necessary to find a case where identical conduct had previously been determined to be unconstitutional,[9] in light of preexisting law, the unlawfulness must be apparent. *See Wilson v. Layne*, 526 U.S. 603, 615 (1999); *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). If judges are in disagreement on an issue at the time the defendant acted, it is "unfair" to later subject the defendant to monetary damages "for picking the losing side in the controversy." *Pearson*, 129 S. Ct. at 823. "Ordinarily, a Supreme Court or Sixth Circuit decision on point is necessary." *Carver v. City of Cincinnati*, 474 F.3d 283, 287 (6th Cir. 2007); *see Jackson v. Schultz*, 429 F.3d 586, 592 (6th Cir. 2005). "Thus, officials are 'entitled to qualified immunity [when] their decision was reasonable, even if mistaken.'" *Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991));

---

[9]"Of course, in an obvious case, [general constitutional] standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau*, 543 U.S. at 199; *Lyons*, 417 F.3d at 572.

*Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) ("Qualified immunity leaves government authorities 'ample room for mistaken judgments.'") (quoting *Scott v. Clay County*, 205 F.3d 867, 873 n. 9 (6th Cir. 2000)). "If reasonable officials could disagree on the issue, immunity should be recognized." *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999); *see Akers*, 352 F.3d at 1042. "For qualified immunity to be surrendered, pre-existing law must dictate, that is truly compel (not just suggest or allow to raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Saylor v. Board of Educ.*, 118 F.3d 507, 514 (6th Cir. 1997). "The burden of convincing a court that the law was clearly established 'rests squarely with the plaintiff.'" *Key*, 179 F.3d at 1000 (quoting *Cope v. Heltsley*, 128 F.3d 452, 459 (6th Cir. 1997)); *see Perez*, 466 F.3d at 427. Plaintiff made no attempt to carry his burden under the second prong of the qualified immunity analysis. I find that defendants Stoley and Stewart are entitled judgment in their favor on plaintiff's Free Exercise Clause claims for monetary damages on the alternative basis of qualified immunity.

B.    RLUIPA Claims

If, as anticipated, the Sixth Circuit joins the other Courts of Appeals and holds that RLUIPA does not authorize a claim for damages against defendants in their individual capacities, a separate discussion of the qualified immunity becomes unnecessary. *See Nelson v. Miller*, No. 08-2044, ___ F.3d ___, 2009 WL 1873500, at * 15-18 (7th Cir. July 1, 2009); *Rendelman v. Rouse*, 569 F. 3d 182, 187-89 (4th Cir. 2009); *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 327-29 (5th Cir. 2009); *Smith v. Allen*, 502 F.3d 1255, 1274 (11th Cir. 2007). Because the issue has not yet been definitively resolved by the Sixth Circuit, qualified immunity is addressed herein. Upon review, I

find that defendants are entitled to judgment in their favor as a matter of law on plaintiff's individual capacity claims for damages under RLUIPA on the alternative basis of qualified immunity.

The Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) states:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C.A. § 2000cc-1(a). "The threshold inquiry under RLUIPA is whether the challenged governmental action substantially burdens the exercise of religion. The burden of proving the existence of a substantial burden rests on the religious adherent." *Baranowski v. Hart*, 486 F.3d 112, 124 (5th Cir. 2007); *see Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 733 (6th Cir. Dec. 10, 2007); *see also Dunlap v. Losey*, 40 F. App'x 41, 43 (6th Cir. 2002) ("RLUIPA . . . requires the complainant to show that his religious exercise was substantially burdened."). At the summary judgment stage, the plaintiff must present evidence of a substantial burden, and "unreasoned say-so" does not suffice. *See Gelford v. Frank*, 310 F. App'x 887, 889 (7th Cir. 2008).

RLUIPA does not define the phrase "substantial burden," and the Supreme Court "has not yet defined 'substantial burden' as it applies to RLUIPA." *Living Water*, 258 F. App'x at 733. In *Living Water*, the Sixth Circuit declined to establish a "bright line test" for determining a "substantial burden." *Id.* at 737. It held that the Supreme Court's Free Exercise jurisprudence provides the appropriate analytical framework. *Id.* at 733. The Sixth Circuit emphasized that in the

Free Exercise context, the Supreme Court has made clear that the "substantial burden' hurdle is high." *Id.* at 734. "[A] 'substantial burden' is a difficult threshold to cross." *Id.* at 736. "'[A] substantial burden must place more than an inconvenience on religious exercise.'" *Id.* at 739 (quoting *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004)). A substantial burden is not established because the government's action makes the religious exercise more difficult or expensive. *Living Water*, 258 F. App'x at 739; *see Patel v. United States Bureau of Prisons*, 515 F.3d 807, 813-14 (8th Cir. 2008). It is patent that plaintiff possessed alternative means of practicing his faith. He has not offered any alternative that would fully accommodate his asserted rights at a *de minimis* cost to the legitimate state interests that gave rise to the restrictions specified in Policy Directive 05.03.150. I find that no reasonable trier of fact could find in plaintiff's favor on the "substantial burden" component of his RLUIPA claims against defendants.

Assuming that plaintiff had presented evidence on which a reasonable trier of fact could find that defendants' actions had resulted in a "substantial burden" on plaintiff's exercise of his faith, defendants would nonetheless be entitled to judgment in their favor as a matter of law because the rights that plaintiff claims under RLUIPA were not clearly established at the time defendants acted. It is not sufficient for plaintiff to simply invoke the existence of the statute, because under the second prong of the qualified immunity analysis, "the right the official is alleged to have violated must have been 'clearly established' in a particularized, and hence more relevant sense." *Lyons*, 466 F.3d at 428. "The U.S. Supreme Court has not yet defined 'substantial burden' as it applies to RLUIPA. Neither does the statute itself contain any definition of the term." *Living Water*, 258 F. App'x at 733. The Sixth Circuit did not address the issue of what constitutes a "substantial burden" under RLUIPA until its unpublished December 2007 decision in *Living Water*,

and the Court of Appeals has provided no additional guidance regarding what constitutes a substantial burden since its *Living Water* decision. The law regarding what constituted a "substantial burden" was not clearly established in 2007 when the defendants acted, indeed, the law is not clearly established through the date of this report and recommendation. Defendants are entitled to qualified immunity.

## Recommended Disposition

For the foregoing reasons, I recommend that defendants' motion for summary judgment be granted, and that judgment be entered in favor of defendants on all plaintiff's claims.

Dated: July 20, 2009               /s/ Joseph G. Scoville                  
                                       United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *McClanahan v. Commissioner*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).